UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DANIEL OLIVA, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3-05-cv-00486 (JCH) |
| BRISTOL-MYERS SQUIBB COMPANY | : | |
| and ROBERT NORMANDIA, M.D., | : | |
| Defendants. | : | |
| | : | DECEMBER 15, 2005 |

**RULING ON PLAINTIFF'S MOTION TO REMAND [Dkt. No. 14]**

**I.  INTRODUCTION**

The present case originated as a state court action by plaintiff Daniel Oliva

("Oliva") against defendants Bristol-Myers Squibb Company ("BMS") and Robert

Normandia, M.D. ("Normandia") (collectively, "defendants").   Oliva sued both

defendants pursuant to the Connecticut Product Liability Act ("CPLA"), Conn. Gen. Stat.

§ 52-572n, et. seq.  The defendants removed the action to federal court pursuant to the

federal removal statute, 28 U.S.C. § 1446.  All parties appear to agree that both Oliva

and Normandia are Connecticut residents, while BMS is a Delaware corporation with its

principal place of business in New York.  They also appear to agree that if Normandia is

a proper defendant in this action, complete diversity would not exist, and remand would

be proper.   However, the defendants argue that Normandia was joined fraudulently

and that his Connecticut residency therefore does not preclude removal.

**II.  STANDARDS OF REVIEW**

The party opposing a motion to remand bears the burden of showing that the

requirements for removal have been met.  California Public Employees' Retirement

Sys.v. WorldCom, Inc., 368 F.3d 86, 100 (2d Cir. 2004) (citing Grimo v. Blue Cross/Blue

Shield of Vermont, 34 F.3d 148, 151 (2d Cir.1994)); 14C Charles Alan Wright, Arthur R.

Miller & Edward H. Cooper, Federal Practice and Procedure § 3739 (3d ed. 1998)

(collecting cases).  "In light of the congressional intent to restrict federal court

jurisdiction, as well as the importance of preserving the independence of state

governments, federal courts construe the removal statute[1] narrowly, resolving any

doubts against removability."  Lupo v. Human Affairs Intern., Inc., 28 F.3d 269, 274 (2d

Cir. 1994) (citing Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 108 (1941); 1A J.

Moore & B. Ringle, Moore's Federal Practice ¶ 0.157, at 38 (2d ed. 1989)).

As a general rule, federal courts have diversity jurisdiction over an action only

where all plaintiffs are citizens of different states from all defendants.  Strawbridge v.

Curtiss, 7 U.S. (3 Cranch) 267 (1806); Pampillonia v. RJR Nabisco, Inc., 138 F.3d 459,

461 (2d Cir. 1998); 13B Wright & Miller, Federal Practice and Procedure § 3605; see 28

U.S.C. § 1332;  Lincoln Property Co. v. Roche, No. 04-712, 2005 WL 3158018, at *3

(Nov. 29, 2005) ("Defendants may remove an action on the basis of diversity of

citizenship if there is complete diversity between all named plaintiffs and all named

defendants, and no defendant is a citizen of the forum State.").   However, plaintiffs

may not, in an effort to defeat federal jurisdiction, join non-diverse defendants against

whom they have no real claims.  The doctrine of "fraudulent joinder" is meant to prevent

this tactic.  Briarpatch Ltd., L.P v. Phoenix Pictures, Inc., 373 F.3d 296, 302 (2d Cir.

2004). To show that a "fraudulent joinder" has occurred, the defendants must do more

---

[1]28 U.S.C. § 1441.

than show that the plaintiff has failed to state a claim upon which relief can be granted. Stan Winston Creatures, Inc. v. Toys "R" Us, Inc., 314 F.Supp.2d 177 (S.D.N.Y. 2003) (citing Pampillonia, 138 F.3d at 461).  Rather, they must "demonstrate, by clear and convincing evidence, either that there has been outright fraud committed in the plaintiff's pleadings, or that there is no possibility, based on the pleadings, that a plaintiff can state a cause of action against the non-diverse defendant in state court." Pampilliona, 138 F.3d at 461; see Briarpatch, 373 F.3d at 302; Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 207 (2d Cir. 2001).  With respect to the latter ground, which is the ground on which defendants rest their argument, "[j]oinder will be considered fraudulent when it is established that there can be no recovery against the defendant[s] under the law of the state on the cause alleged." Whitaker, 261 F.3d 196, 207 (internal citation and original brackets omitted).  "The defendant seeking removal bears a heavy burden of proving fraudulent joiner, and all factual and legal issues must be resolved in favor of the plaintiff."  Pampillonia, 138 F.3d at 461.

Citing In Re Rezulin Prods. Liability Litig., 133 F.Supp.2d 272 (S.D.N.Y. 2001), defendants argue that the phrase "no possibility" "cannot be taken literally and the standard is more accurately described as requiring a showing that there is 'no reasonable basis' for predicting liability on the claims alleged."  Defs.' Mem. Opp. Plfs.' Mot. Remand at 3 [Dkt. No. 16].  Oliva, for his part, argues that courts in this district construe the "no possibility" standard more strictly.  He cites Deming v. Nationwide Mutual Ins. Co., No. Civ.A. 3:03CV1225 (CFD), 2004 WL 332741 (D. Conn. Feb. 14, 2004) and Wise v. Lincoln Logs, Ltd., 889 F.Supp. 549 (D.Conn. 1995).  However, these cases do not apply the "no possibility" language in a truly literal fashion.

3

Deming held that, "'[i]n a fraudulent joinder inquiry, federal courts are not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law.'" 2004 WL 332741, at *4 (quoting Pacheco De Perez, 139 F.3d 1368, 1380-81 (11th Cir. 1998)). Wise, decided prior to Pampilliona, actually applied a "reasonable basis" standard similar to the one the defendants urge upon the court. Wise held that the "'stringent test' for fraudulent joinder requires that if there is any reasonable basis for predicting that the controlling substantive law might grant the plaintiff the relief he seeks against the non-diverse defendant, the court will not disregard him as a nominal defendant and the case must be remanded." 889 F.Supp. at 552 (quoting Metropolitain Prop. & Cas. Ins. Co. v. J.C. Penney Cas. Ins. Co., 780 F.Supp. 885, 887 (D. Conn. 1991) (emphasis in original)). The court does recognize that various district courts in this circuit have interpreted the Pampillonia language in slightly varying ways. See In re Consolidated Fen-Phen Cases, 2003 WL 22682440, at *3 (E.D.N.Y. Nov. 12, 2003) (citing Rezulin Products, 133 F.Supp.2d; Arseneault v. Congoleum Corp., No. 01 Civ. 10657, 2002 WL 472256, at *5 n. 4 (S.D.N.Y. Mar.26, 2002) (disagreeing with Rezulin Products interpretation and applying a more literal "no possibility" standard); Stan Winston Creatures, Inc. v. Toys "R" US, Inc., No. 02 Civ. 9809, 2003 WL 1907978, at *4 (S.D.N.Y. Apr.17, 2003) ("legally impossible" standard); Nemazee v. Premier, Inc., 232 F.Supp.2d 172, 178 (S.D.N.Y. 2002) ("Any possibility of recovery, even if slim, militates against a finding of fraudulent joinder; only where there is 'no possibility' of recovery is such a finding warranted.") (citation omitted)). However, the court finds that it need not choose among these interpretations for the purposes of the present motion. For the reasons set forth in the Discussion below, the court finds no fraudulent joinder

4

in the present case, even if it interprets the Pampillonia "no possibility" standard as "no reasonable basis" for predicting liability.  Moreover, Pampillonia's requirement that the party opposing remand prove this standard "by clear and convincing evidence" means that even that standard is a high one.

In conducting a fraudulent joinder inquiry, "courts can look beyond the pleadings to determine if the pleadings can state a cause of action."  Consolidated Fen-Phen Cases, 2003 WL 22682440, at *3 (citing Arseneault v. Congoleum, No. 01 Civ.10657(LMM), 2002 WL 472256, at *6 (Mar. 26, 2002) (holding that, in deciding whether fraudulent joinder had occurred, the court would look outside the pleadings to depositions and other evidence, because the Second Circuit has held that district courts can do so in deciding jurisdictional issues) (quoting United Food & Commercial Workers Union, Local 919, AFL-CIO v. CenterMark Props. Meriden Square, Inc., 30 F.3d 298, 305 (2d Cir.1994)); Pampillonia, 138 F.3d at 461-62 (considering affidavit to determine whether defendant was fraudulently joined); In re Rezulin Prods. Liability Litig., 133 F.Supp.2d 272, 281-82 (S.D.N.Y. 2001) (same)).  Thus, the court will consider exhibits submitted by the parties, including Normandia's Affidavit, Defs.' Mem. Opp. Mot. Remand, Ex. D [Dkt. No. 16].

## III.  FACTS

Oliva alleges that he suffered severe injuries as a result of his use of the drug Tequin, which was manufactured, sold, and distributed by BMS.  Tequin was allegedly "in a defective condition unreasonably dangerous to consumers or users such as the plaintiff."  Compl. ¶ 11.  Oliva's Complaint asserts that Normandia, a medical doctor, "was engaged" by BMS "to visit or detail physicians' offices, hospitals, and other health

care facilities to promote Tequin and to encourage physicians and other health care providers to prescribe, recommend, or utilize Tequin for patients." Compl. ¶ 3, 7.  It further alleges that Normandia "made numerous sales and marketing calls on the plaintiff's treating physician, Dr. Nelson Chao" ["Dr. Chao"] and that, during those calls, Normandia "bought lunch for the entire office and made a sales and marketing presentation concerning the alleged value of Tequin in treating various infections." Id. at ¶ 8.  These sales and marketing calls allegedly caused Oliva's physician to prescribe Tequin to him. Id. at ¶ 9.  The Complaint alleges that Normandia violated Connecticut General Statutes § 52-572m, et. seq. (CPLA) in numerous respects, several of which involve failures to provide adequate warnings to  Oliva, health care providers, or the public regarding the inherent dangers and proper use of Tequin.

Normandia has submitted an affidavit in opposition to the motion to remand.  He states that he was employed by BMS from December 1999 through June/July 2003 as a "detail person" and that he never worked as an independent contractor for BMS.  He states that his "job responsibilities included visiting physicians in order to provide them with information about Tequin," that he provided solely information supplied by BMS, and that he promoted the drug only "in accordance with BMS policy."  He disavows any role in the "design, production, manufacture, testing or labeling" of Tequin.  He states that he "never sold, took, or processed orders" of the drug, played no role in its purchase by physicians or consumers, and financed no purchases thereof.  He also asserts that he lacked any ownership interest in drugs sold by BMS and that he "never acted as a distributor or retailer for the product."

## IV.  DISCUSSION OF CPLA CLAIM

The CPLA created a statutory cause of action for product liability claims.  It encompasses all previous common law actions against "product sellers, including actions of negligence, strict liability, and warranty, for harm caused by a product." Conn.Gen.Stat. § 52-572n; see Densberger v. United Technologies Corp., 297 F.3d 66, 70 (2d Cir. 2002) (holding that the CPLA incorporates all Connecticut common law causes of action for product liability unless they are expressly inconsistent with the statute); James H. Rotondo & Paul D. Williams, Connecticut Product Liability Law 1 (1998) (internal citations omitted).

### A. Could Normandia's actions make him a "product seller"?

To be liable under the CPLA, a defendant must be a "product seller." "Whether a defendant is a 'product seller' is a question of law."  Stanko v. Bader, No. CV030193669, 2003 WL 22413476, at *2 (Conn.Super. Oct. 7, 2003) (citing Burkert v. Petrol Plus of Naugatuck, Inc., 216 Conn. 65, 72 (1990)). The CPLA defines "product seller" as:

> any person or entity, including a manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption.  The term "product seller" also includes lessors or bailors of products who are engaged in the business of leasing or bailment of products.

The CPLA was modeled on the United States Department of Commerce's Draft Uniform Product Liability Law ("Draft Act"), 44 Fed. Reg. 2996-3019 (1979), see Svege v. Mercedes-Benz Credit Corp., 329 F.Supp.2d 272, 279 n.6 (D.Conn. 2004) (citing Elliot v. Sears, Roebuck & Co., 229 Conn. 500, 511-12 (1994); Vitanza v. Upjohn Co.,

7

257 Conn. 365, 386-88 (2001); <u>Potter v. Chicago Pneumatic Tool Co.</u>, 241 Conn. 199, 230-31 (Conn. 1997)).  Therefore, the Connecticut Supreme Court has looked to the commentary from that draft for guidance in applying CPLA sections similar to sections of the Draft Act.  <u>Vitanza</u>, 257 Conn. at 387.  The CPLA product seller definition is identical to section 102(1) of the Draft Act.  The commentary to the Draft Act states that this definition "includes all parties in the regular commercial distribution chain."  44 Fed. Reg. 3003. It also suggests "that a party be considered a product seller where a sale of a product is a principal part of the transaction and where the essence of the relationship between the buyer and seller is not the furnishing of professional skill or services." <u>Id.</u> (emphasis omitted), <u>quoted in</u> <u>Truglio v. Hayes Construction Co.</u>, 66 Conn.App. 681, 685 (2001); <u>Silva v. Walgreens Eastern Co.</u>, No. CV044001615S, 2005 WL 3163860 (Conn. Super. Oct. 24, 2005); <u>Stanko</u>, 2003 WL 22413476.[2]

Connecticut courts have not addressed whether a sales representative or "detail man" for a pharmaceutical company is a product seller for CPLA purposes.[3]  In discussing the contours of the product seller definition, however, the Connecticut Supreme Court has examined a defendant's "involvement in the stream of commerce." <u>Burkert</u>, 216 Conn. at 72 (holding that a company that licensed a product manufactured, marketed, and sold by others was not a product seller).  Though the

---

[2]   Both <u>Silva</u> and <u>Stanko</u> relied on the latter statement to hold that a pharmacist who fills a prescription incorrectly is a product seller.  <u>See</u> <u>Silva</u>, 2005 WL 3163860 (holding that a pharmacist who filled a prescription with the wrong drug was a product seller, because the drug was a product and the learned intermediary doctrine did not apply); <u>Stanko</u>, 2003 WL 22413476 (reaching the same holding, because "the principal part of the transaction was the sale of medication").  <u>But see</u> <u>Altieri v. CVS Pharmacy, Inc.</u>, 2002 WL 31898323 (Conn. Super. Dec. 13, 2002) (holding, in a factually similar case, that a pharmacy was performing a service rather than selling a product) (not citing the Draft Act and relying on a California decision).

[3] The commentary to the Draft Act does not address this issue either.  <u>See</u> 44 Fed. Reg. 3003.

analysis that the Supreme Court undertook was very fact-specific, several factors

appeared significant to the court's decision.  These include whether the defendant

derived substantial economic benefit from its activity, whether it took title to the product

in the process of distribution, and the extent of its knowledge of and control over the

product.  Id. at 68-69; see also Svege, 329 F.Supp. at 279-80 (summarizing Burkert

and discussing the first two factors above).  In the context of discussing the lack of

financial benefit flowing to the defendant from the licensing program, the Burkert Court

also noted that the defendant had not established the licensing program as a way to

market its own brand.  Burkert, 216 Conn. at 68; see Svege, 329 F. Supp. at 279-80

(holding that, under Burkert, "engaging in an active advertising campaign to promote

sales of the product" is a factor that indicates significant involvement in bringing a

product to market).  Judge Kravitz of this District found Burkert's standard satisfied

where a defendant had "significant participation and involvement in the stream of

commerce that brought [products] . . . into the hands of end users."[4]  Svege, 329 F.

Supp. at 280 (holding that a finance lessor was a product seller).

    In interpreting and applying the product seller definition, the court also bears in

mind the Connecticut Appellate Court's observation that a "principal purpose of the

product liability statute is to protect people from harm caused by defective and

hazardous products," and that courts should construe the statute with this purpose in

mind.  Rodia v. Tesco Corp., 11 Conn.App. 391, 396 (1987) (construing broadly the

---

[4]As the defendants correctly point out, Svege involved a defendant who financed leases of a product, a role quite different from that attributed to Normandia.  However, the court nevertheless finds it relevant to examine the factors Judge Kravitz considered significant in determining that such a defendant was a product seller.

types of conduct enumerated in the CPLA).  Following this directive, the court reads the

"product seller" definition as encompassing those in the best position to protect

consumers.  See also Durove v. Fabian Transport Inc., No. 04 Civ 7000(RJH), 2004

WL 2912891, at * 6 (S.D.N.Y. Dec. 14, 2004) (stating that courts interpreting the law of

other jurisdictions have construed product seller definitions broadly in the context of

strict products liability and holding that a pharmaceutical representative was a product

seller under New York common law) (internal citations omitted).

Resolving all factual and legal ambiguities in Oliva's favor, the court cannot find

that the defendant has met its burden of showing "no possibility" of liability on the part

of Normandia.  While Normandia's involvement may have been less substantial than

that of the defendant in Svege, it appears more substantial than that of the defendant in

Burkert.  Even if Normandia did not hold title to or ownership interest in the product, and

did not carry out the sales himself, the pleadings and affidavit are not inconsistent with

a claim that he derived substantial economic benefit from his activities in promoting the

product.[5]   Moreover, although he does not appear to have had control over the design

or manufacture of the product or the design of marketing materials, he is alleged to

have extensive knowledge of the product and to have convinced Dr. Chao to prescribe

Tequin to Oliva.  A court could find that Normandia's allegedly deliberate and

successful efforts to promote the sale of Tequin rendered the sale "a principal part of

the transaction" between Normandia and Dr. Chao, 44 Fed. Reg. 3003, and that they

show significant involvement in the stream of commerce that brought the product to the

---

[5]For example, the evidence could show that Normandia's compensation was tied to his success in promoting Tequin.

end user.  Moreover, it could reasonably find that Normandia, who had extensive knowledge of Tequin and allegedly convinced Dr. Chao to prescribe the drug to Oliva, was particularly well placed to avert the injury to Oliva, by warning Dr. Chao of Tequin's dangers and instructing him on proper use.

        In addition to their argument that Novadia's activities were not in the nature of those of a product seller, the defendants also suggest that he cannot be held individually liable for his activities because he provided information about Tequin only as an agent for BMS, and not in his individual capacity.  Oliva argues that whether Normandia was an employee or an independent contractor "is a factual and legal ambiguity that must be resolved in favor of the plaintiff" on the present motion. Normandia's Affidavit states that he was an employee and has never been an independent contractor for BMS, whereas Oliva's Complaint alleges that Normandia was "engaged by BMS."  Although the court finds some ambiguity in whether Oliva's Complaint was truly asserting that Normandia was other than an employee, "all factual and legal issues must be resolved in favor of the plaintiff." Pampilliona, 138 F.3d at 461.  Thus, the court cannot find at this stage that Normandia was necessarily an employee.

        Moreover, Normandia could be held individually liable for his own actions even if he were an employee, and even if he performed the allegedly tortious acts as an agent for BMS.  Where "an agent . . . commits or participates in the commission of a tort, whether or not he acts on behalf of his principal . . . , he is liable to third persons injured thereby."  Scribner v. O'Brien, 169 Conn. 389, 404 (Conn. 1975) (discussing a negligence action); see Maturo v. Gerard, 196 Conn. 584, 588 (applying Scribner rule in

11

negligent misrepresentation case); <u>Avitabile v. Criscuolo</u>, No. CV94-0357059, 1994 WL

597373 (Conn. Super. Oct. 24, 1994) (citing <u>Scribner</u> and holding that one defendant in

a negligence action could be held liable for actions he performed on behalf of a co-

defendant); <u>Keeney v. Adams</u>, 1992 WL 209652 (Conn.Super. Aug. 25, 1992) (holding

that <u>Scribner</u> rule applied to strict liability action).  Thus, whether or not Normandia was

an employee is not dispositive to this ruling.

The court pauses briefly to note its reasons for rejecting the reasoning in several

decisions, cited by defendants, that held that sales representatives were not sellers

under the law of other states.   In <u>In re Rezulin Prods. Litig.</u>, 133 F.Supp.2d 272

(S.D.N.Y. 2001), the court interpreted the word "seller" as used in the Mississippi

Uniform Commercial Code ("UCC"), Miss. Code Ann. § 75-2-314.  The Mississippi UCC

defines this term more narrowly than the CPLA and governs contracts rather than

products liability torts, and defendants cite no authority suggesting that the Mississippi

UCC definition is interpreted similarly to the CPLA's.[6]   <u>Dacosta v. Novartis AG</u>, No. CV

01-800-BR, 2002 WL 31957424 (D.Or. Mar. 1, 2002) did interpret a product liability

statute, O.R.S. § 30.920,[7]  and looked for guidance to the Restatement (Second) of

---

[6]The Mississippi UCC defines "seller" as "a person who sells or contracts to sell goods."  <u>Id.</u> at §
75-2-103.  This definition would not necessarily be construed as broadly as the CPLA definition, because
the UCC is not intended primarily to protect people from defective and hazardous products.  <u>Cf.</u>  <u>Rodia v.
Tesco Corp.</u>,11 Conn.App. 391, 396 (1987) (holding that the CPLA's definition of "product liability claim"
must be construed broadly, "to reach all conduct which affects the safety of a product prior to its entry into
the stream of commerce," in light of the purpose of the statute "to protect people from harm caused by
defective and hazardous products.")

[7]The Oregon statute states that:

One who sells or leases any product in a defective condition unreasonably dangerous to the user
or consumer or to the property of the user or consumer is subject to liability for physical harm or
damage to property caused by that condition . . . ,

O.R.S. § 30.920, but does not otherwise define product seller.

Torts section 402A,[8] but the Oregon statute differs somewhat from the CPLA.[9]

Moreover, the Dacosta court reasoned that a detail man could not be a product seller

because he was "merely an employee" of a drug company, and that he lacked

ownership or control over the drugs.  As discussed above, supra at 8-12, neither of

these reasons is necessarily dispositive under Connecticut law.  Finally, in In re Diet

Drugs Prod. Liability Litig., 2004 WL 1824357 (E.D. Pa. 2004), the court construed

Mississippi common law.  Its holding that a sales representative was not a "seller" relied

solely on one decision from the Southern District of Mississippi, which held that a

store's manager was not a seller because he was an employee, and therefore agent, of

the company that owned the store. Id. at *8 (citing McCurtis v. Dolgencorp, Inc., 968

F.Supp. 1158, 1160-61 (S.D.Miss. 1997).  For the reasons discussed above, the court

declines to import this reasoning to its analysis of the CPLA.

Considering that Connecticut courts have never addressed the question of

whether a pharmaceutical "detail man" may be a product seller under the CPLA, and

that a number of the factors Connecticut courts have identified as relevant to the

---

[8] Connecticut courts have cited this section of the Restatement in interpreting some provisions of the CPLA and the common law actions it encompasses, though they have not addressed the specific question of whether the Restatement's "seller" definition applies to the CPLA.  See, e.g., Potter v. Chicago Pneumatic Tool Co., 241 Conn. 199, 214-16 (Conn. 1997) (rejecting a proposed rule in the Draft Restatement (Third) of Torts that would require a showing of reasonable alternative design to prove a product was unreasonably dangerous, but following the traditional rule from the Restatement (Second) section 402A), cited in Vitanza v. Upjohn Co., 48 F.Supp.2d 124 (D.Conn. 1999); Giglio v. Connecticut Light & Power Co., 180 Conn. 230, 235-36 (Conn. 1980) (liability for failure to warn), quoted in LaMontagne v. E.I. Du Pont De Nemours & Co., Inc., 41 F.3d 846, 859 (2d Cir. 1994).

[9] The Oregon statute states that:

One who sells or leases any product in a defective condition unreasonably dangerous to the user or consumer or to the property of the user or consumer is subject to liability for physical harm or damage to property caused by that condition . . . ,

O.R.S. § 30.920, but does not otherwise define product seller.

product seller inquiry weigh in favor of an affirmative conclusion, this court finds a

reasonable basis for predicting that Normandia could be found to be a product seller.

**B. Could Normandia's conduct fall within the CPLA's definition of "product liability claim"?**

The CPLA defines "product liability claim" to include all claims for "personal

injury, death, or property damage caused by the manufacture, construction, design,

formula, preparation, assembly, installation, testing, warnings, instructions, marketing,

packaging or labeling of any product."  Conn.Gen.Stat. § 52-572m(b); see id. at § 52-

572n(a).[10]  Courts construe this language broadly.  Rodia v. Tesco Corp.,11 Conn.App.

391, 396 (1987).

> A principal purpose of the product liability statute is to protect people from
> harm caused by defective and hazardous products.  In order to meet this
> purpose, it is necessary that the statute be read to reach all conduct which
> affects the safety of a product prior to its entry into the stream of
> commerce. The terms enumerated in General Statutes § 52-573m(b) are
> simply generic categories of conduct which must be read broadly and in
> relationship to one another in order to accomplish the purposes of the
> statute.

Id.  A reasonable possibility exists that Normandia could be liable for a failure to warn

Dr. Chao or his patients of the dangers posed by Tequin.  In Connecticut, a "product

may be defective because a manufacturer or seller failed to warn of the product's

unreasonably dangerous propensities."  Vitanza v. Upjohn Co., 257 Conn. 365, 378

(2001) (quoting Tomer v. Am. Home Prods. Corp., 170 Conn. 681, 689 (1976)) (internal

---

[10] Such claims may be brought on theories of "strict liability in tort; negligence; breach of warranty;
. . . breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent;
misrepresentation or nondisclosure, whether negligent or innocent" Id. at § 52-572m; see James H.
Rotondo & Paul D. Williams, Connecticut Product Liability Law 1 (1998) (citing Gajewski v. Pavelo, 36
Conn. App. 601, 611 (1994), aff'd, 236 Conn. 27 (1996); Lynn v. Haybuster Mfg., Inc., 226 Conn. 282, 292
(1993) (summarizing the CPLA's legislative history)).

quotation marks omitted); <u>Ames v. Sears, Roebuck & Co.</u>, 8 Conn.App. 642, 645 (1986)

(quoting <u>Tomer</u>) (internal quotation marks and additional internal citations omitted).

"Under such circumstances, the failure to warn, by itself, constitutes a defect."  <u>Ames</u>, 8

Conn.App. at 645.  Thus, if Normandia was a product seller, his alleged failure to

adequately warn Dr. Chao or his patients about unreasonably dangerous propensities

of Tequin could subject him to liability under the CPLA.

The defendants argue that, "[p]ursuant to the learned intermediary doctrine, any

duty to warn a physician about the dangers of a drug is placed upon the manufacturer

and not its sales representatives."  This characterization of the learned intermediary

doctrine is unsupported by the caselaw.  This doctrine is an affirmative defense that

relieves drug manufacturers of a duty to directly warn the ultimate users of their product

where the manufacturers have adequately warned the prescribing physicians, or

learned intermediaries.  <u>Vitanza v. Upjohn Co.</u>, 257 Conn. 365 (Conn. 2001).  Thus,

even if the learned intermediate doctrine were found to apply to Normandia, it would

only shield him from liability for failing to warn Oliva directly if he established that he had

adequately warned Dr. Chao about the dangers of the drug.[11]  This fact is not clearly

established by the pleadings or other facts before the court.

---

[11] In support of their argument regarding the learned intermediary doctrine, the defendants note
that the Eastern District of Pennsylvania has held that sales representatives, as employees of a drug
company, do not assume individual liability merely by participating in their employer's failure to provide
adequate information.  <u>In re Diet Drugs Prods. Liability Litig.</u>, Civil Action No. 03-20376, 2004 U.S. Dist.
LEXIS 12239, at *8-*9 (June 18, 2004).  Even if this court were to agree with defendants that the Eastern
District of Pennsylvania's holding in this respect properly rested on the learned intermediary doctrine,
which it does not, that opinion interpreted Mississippi common law.  The defendants cite no authority
suggesting that sales representatives are exempted from the duty to warn under the CPLA.

The defendants raise no other arguments in support of a finding of fraudulent joinder.  They have failed to carry their burden of demonstrating, "by clear and convincing evidence, . . . that there is no possibility" that Oliva "can state a cause of action against the non-diverse defendant in state court."  Normandia will remain a defendant in this case.  Thus, diversity is destroyed, and the case must be remanded to state court.

## IV.  CONCLUSION

For the foregoing reasons, Oliva's Motion to Remand **[Dkt. No. 14]** is hereby **GRANTED**, and the instant case is **REMANDED** to the Connecticut state court.


**SO ORDERED.**

Dated at Bridgeport, Connecticut this 15th day of December, 2005.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge

16